186 N.J. Super. 548 (1982)
453 A.2d 263
GABRIELLE NAPOLITANO, PLAINTIFF-APPELLANT,
v.
THE TRUSTEES OF PRINCETON UNIVERSITY, WILLIAM G. BOWEN, INDIVIDUALLY AND AS PRESIDENT OF PRINCETON UNIVERSITY, PETER ONEK, INDIVIDUALLY AND AS ASSISTANT DEAN OF STUDENT AFFAIRS OF PRINCETON UNIVERSITY, SYLVIA MOLLOY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 1982.
Decided October 13, 1982.
*550 Before Judges MATTHEWS, FRANCIS and GREENBERG.
Nathan M. Edelstein argued the cause for appellant (Brener, Wallack & Hill, attorneys; Nathan M. Edelstein and J. Charles Sheak on the brief).
*551 William J. Brennan, III argued the cause for respondents (Smith, Stratton, Wise, Heher & Brennan, attorneys; Alexander P. Waugh, Jr. on the brief).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
When this action was instituted plaintiff was a student in her senior year at Princeton University, a member of the Class of 1982. Were it not for the disciplinary action which precipitated this litigation, she would have been eligible to graduate on June 8, 1982. She is presently eligible to graduate in June 1983, at which time she will receive a Bachelor of Arts degree, with a major in English.
Defendant, The Trustees of Princeton University, is an educational corporation in the State of New Jersey. It operates a private institution of higher education known as Princeton University. Princeton offers undergraduate programs leading to the degrees of Bachelor of Arts and Bachelor of Science in Engineering.
Defendant William G. Bowen is the President of Princeton University. He has held that position since July of 1972. According to the University's By-Laws, the President is the "chief executive officer of the Corporation" and is "charged with the general supervision of the interests of the University."
Among the many functions exercised by President Bowen is the power to review and, when appropriate, to modify the penalties imposed by various disciplinary bodies at Princeton, including the Faculty-Student Committee on Discipline (COD).
Defendant Peter Onek is an Assistant Dean of Student Affairs at Princeton, having held that position since August of 1977. As Assistant Dean of Student Affairs, Dean Onek is Secretary of the COD, but not a voting member. Dean Onek's duties as Secretary include (1) receiving disciplinary charges from faculty members, proctors or others, (2) notifying students of such charges, (3) counseling students on their rights and the *552 procedures of the COD, (4) coordinating the presentation of documentary and other evidence to the COD and (5) taking and, when appropriate, preparing the minutes of the COD meetings. Dean Onek performed each of those duties in connection with the first disciplinary hearing but was voluntarily replaced for the second hearing, although replacement was not required by the trial judge.
Defendant Sylvia Molloy is a Professor of Spanish in the Department of Romance Languages and Literatures. She began teaching at Princeton in 1970 as an Assistant Professor with a Bicentennial Preceptorship. In 1973 Professor Molloy was promoted to Associate Professor, a tenured position. In 1981 she became a full Professor.
During the Fall Term of the 1981-1982 academic year Professor Molloy taught Spanish 341, a course entitled "The Spanish American Novel." Plaintiff elected to become a student in that course. It was her submission of a term paper for that course which gave rise to the disciplinary proceedings here under review.
Princeton maintains a bifurcated disciplinary system with nonconcurrent jurisdiction in two committees for the purpose of disciplining undergraduate students: the Princeton Honor Committee, which is concerned with examinations given under Princeton's Honor System, and the Faculty-Student Committee on Discipline.
All disciplinary matters concerning undergraduates which do not involve in-class examinations are subject to the jurisdiction of the COD. This includes academic violations, such as plagiarism on essays, term papers or laboratory reports, and nonacademic violations, such as disorderly conduct or drug-related offenses. The COD is a Standing Committee of the Faculty of Princeton University. Rules and Procedures of the Faculty of Princeton University (July 1978 with Addenda).
A general description of some of the rules and procedures of the COD is found in a booklet entitled Rights, Rules, Responsibilities *553  1980 Edition (RRR-1980). The penalty section lists the following penalties:

Range of Penalties. For violation of University-wide rules of conduct, members of the community are subject to several kinds of penalties. The applicability and exact nature of each penalty varies for faculty, students, professional staff, and employees; but in general the penalties, in ascending order of severity, are:
1. Warning ...

2. Disciplinary Probation. A more serious admonition assigned for a definite amount of time, up to two years. It implies that any future violation, of whatever kind, during that time, may be grounds for suspension, required withdrawal, or in especially serious cases, for expulsion, from the University.
3. Suspension. Removal from membership in, or employment by, the University for a specified period of time.
4. Required Withdrawal. Removal from membership in, or employment by, the University for at least the period of time specified by suspension, with the suspension to continue until certain conditions, stipulated by the appropriate body applying this sanction, have been fulfilled. These conditions may include restitution of damages or formal apology.
5. Expulsion ...

6. Censure ...

A withheld degree, the penalty imposed upon plaintiff, is a less severe variation of suspension. It is imposed only upon second semester seniors. It permits them to finish their academic requirements and wait the prescribed period to receive their degree, rather than requiring them to lose their tuition and repeat their last semester in the following academic year. Excluding plaintiff's case, Princeton has withheld 20 degrees for disciplinary reasons since the 1972-1973 academic year.
There are two avenues of appeal from the decision and penalty of the COD: to the Judicial Committee of the Council of the Princeton University Community (Judicial Committee) and to the President of the University. Only the Judicial Committee avenue of appeal appears in the written material. A direct appeal to President Bowen from the COD is not mentioned in RRR-1980 or any other University publication, but, we are advised, is the avenue chosen in the overwhelming number of cases in which there is an appeal.
The appellate jurisdiction exercised by the President of the University is generally confined to a review of the penalty. It is *554 accurately described in the RRR section concerning appeals from the Judicial Committee.
RRR contains a lengthy section concerning the "general requirements" or "fundamental principles" for the acknowledgment of sources in academic work:
General Requirements for the Acknowledgment of Sources in Academic Work
The academic departments of the University have varying requirements for the acknowledgment of sources, but certain fundamental principles apply to all levels of work. In order to prevent any misunderstanding, students are expected to study and comply with the following basic requirements.

Quotations. Any quotations, however small, must be placed in quotation marks or clearly indented beyond the regular margin. Any quotation must be accompanied (either within the text or in a footnote) by a precise indication of the source  identifying the author, title, place and date of publication (where relevant), and page numbers. Any sentence or phrase which is not the original work of the student must be acknowledged.

Paraphrasing. Any material which is paraphrased or summarized must also be specifically acknowledged in a footnote or in the text. A thorough rewording or rearrangement of an author's text does not relieve one of this responsibility. Occasionally, students maintain that they have read a source long before they wrote their papers and have unwittingly duplicated some of its phrases or ideas. This is not a valid excuse. The student is responsible for taking adequate notes so that debts of phrasing may be acknowledged where they are due.

Ideas and Facts. Any ideas or facts which are borrowed should be specifically acknowledged in a footnote or in the text, even if the idea or fact has been further elaborated by the student. Some ideas, facts, formulae, and other kinds of information which are widely known and considered to be in the "public domain" of common knowledge do not always require citation. The criteria for common knowledge vary among disciplines; students in doubt should consult a member of the faculty.
Occasionally, a student in preparing an essay has consulted an essay or body of notes on a similar subject by another student. If the student has done so, he or she must state the fact and indicate clearly the nature and extent of his or her obligation. The name and class of the author of an essay or notes which are consulted should be given, and the student should be prepared to show the work consulted to the instructor, if requested to do so.

Footnotes and Bibliography. All the sources which have been consulted in the preparation of an essay or report should be listed in a bibliography, unless specific guidelines (from the academic department or instructor) request that only works cited be so included. However, the mere listing of a source in a bibliography shall not be considered a "proper acknowledgement" for specific use of that source within the essay or report.
....
*555 This description of "fundamental principles" is followed by a series of definitions of "academic fraud" within the jurisdiction of the COD:
With regard to essays, laboratory reports, or any other written work submitted to fulfill an official academic requirement, the following are considered academic fraud:

Plagiarism. The deliberate use of any outside source without proper acknowledgment. "Outside source" means any work, published or unpublished, by any person other than the student.
........
Please note that, while not all academic infractions involve fraud, all are violations of the University's standards and will normally result in disciplinary penalties.
Because of the importance of original work in the Princeton academic community, each student is required to attest to the originality of the submitted work and its compliance with University regulations:
Student Acknowledgment of Original Work
At the end of an essay, laboratory report, or any other requirement, the student is to write the following sentence and sign his or her name: "This paper represents my own work in accordance with University regulations." [Emphasis in original]
RRR also presents a brief but fairly complete discussion of violations and examples of violations of these regulations.
At the first class meeting of Spanish 341 Professor Molloy announced that the course requirements would be a term paper and midterm and final examinations. The term paper was to be a critical analysis of one of the works read for the course, on a topic which was to be chosen by the student but approved by Professor Molloy. The paper could be handed in at any time during the Fall Term, but no later than January 13, 1982, the last day of Princeton's reading period.
Plaintiff did not meet with Professor Molloy to seek approval of her topic until December 16, 1981, the last day of classes before the Christmas recess. She was one of the last, if not the last, to seek such approval from Professor Molloy.
Plaintiff told Professor Molloy that she wanted to write her paper on the family ties in a novel entitled Cien anos de soledad *556 (100 Years of Solitude) by Gabriel Garcia Marquez. Professor Molloy approved the topic and told plaintiff that she ought to read Cien anos de soledad: una interpretacion by Josefina Ludmer (Ludmer), a book which Professor Molloy had put on library reserve at the beginning of the Fall Semester. At her deposition, Professor Molloy described Ludmer's work as "a very highly personal and highly original work" and "revolutionary" in that it "allowed people to perceive [100 years] in a completely different light." Professor Molloy told plaintiff to read or be aware of Ludmer, which treated "important aspects of the topic" plaintiff had chosen.
Plaintiff has testified that Ludmer was the only book to which she referred in writing her paper. Although she also testified that she did not have Ludmer in front of her when she wrote her paper, she admitted that she did refer to her notes, all of which had been prepared while she was reading Ludmer.
Plaintiff's paper was entitled "Un analisis de la estructura de Cien anos de soledad." It consisted of 12 typewritten pages, plus a title page and a page of footnotes. The paper was written in Spanish.
A simple comparison of plaintiff's paper and Ludmer reveals numerous sections of the paper which are taken verbatim, or in other portions virtually verbatim, from Ludmer, but which are not put into quotation marks or indented and which are not footnoted. At the end of her paper plaintiff wrote and signed the acknowledgment of originality required by RRR, in Spanish: "This paper represents my own work in accordance with University regulations."
On or about January 21, 1982 Professor Molloy began to correct plaintiff's paper. As soon as she began reading the first page she "sensed there was something wrong" and wrote, "Is this yours?", in Spanish, on the margin. She did not go beyond the first page, which contains no footnote or reference to Ludmer, before she "realized that Gabrielle Napolitano had not written what [she] was reading."
*557 On January 22, 1982, after completing her review of plaintiff's paper and Ludmer, Professor Molloy consulted RRR-1980 and the Faculty Rules. Pursuant to the instruction at page 80 of the Faculty Rules, Professor Molloy telephoned Dean Onek and told him about plaintiff's paper. Dean Onek told her to send him a letter, with the paper and Ludmer, to present the copied material as clearly as possible and to turn in an "Incomplete" as plaintiff's grade in the course.
On January 26, 1982 Professor Molloy sent the letter Dean Onek had requested, setting forth her charge of plagiarism against plaintiff.
Between his receipt of Professor Molloy's letter and the date of the first COD hearing, Dean Onek met with plaintiff on four separate occasions. In the course of those meetings Dean Onek explained the various written and unwritten rules and procedures of the COD. He gave plaintiff copies of her paper, Ludmer and Professor Molloy's letter. He also sent plaintiff a formal letter notifying her of the hearing. At plaintiff's request Dean Onek spoke by telephone to her parents' attorney during one of their meetings.
The first COD hearing took place on Thursday, February 11. Plaintiff arrived at about 8 a.m. While she and her advisor waited in Dean Onek's office, the Dean distributed copies of Professor Molloy's letter, plaintiff's paper and the photocopy of Ludmer to members of the COD for their review. Contrary to plaintiff's claim otherwise, Professor Molloy did not meet with the Committee during that 20-minute period. She was waiting in another office while plaintiff and her advisor were in Dean Onek's office. Professor Molloy entered the hearing room about one minute prior to plaintiff.
As Secretary of the COD, Dean Onek took notes at the hearing which were transformed into the minutes sent to President Bowen. The minutes describe the hearing in some detail, but we do not have need to refer to them because the results of this hearing were mooted by the remand and rehearing ordered by the trial judge.
*558 After the COD unanimously voted to find plaintiff guilty of plagiarism and withhold her degree for one year, Dean Onek informed her of the decision and subsequently met with her to explain the right of appeal.
Plaintiff met with President Bowen's assistant to discuss the appeal sometime before February 18, 1982, the date on which she wrote a letter to President Bowen, appealing to him for "clemency."
Plaintiff met with President Bowen and his assistant on Friday, February 26, 1982. President Bowen and plaintiff discussed her appeal. Although plaintiff claims that President Bowen stated that her conduct was an "unconscious act," there is no independent support of that found in the record.
President Bowen reviewed the file materials regarding proceedings before the COD and also received a letter on plaintiff's behalf from Professor Aarsleff. On March 1, 1982 President Bowen wrote to plaintiff to inform her that he had decided to uphold the determination of the COD.
A verified complaint was filed on April 22, 1982, at which time the trial judge entered an order to show cause scheduling a hearing on plaintiff's request for injunctive relief. Plaintiff's 14-count, verified complaint stated a wide variety of legal theories, all of which were directed to an attack upon the finding of plagiarism at Princeton University and the resulting penalty.
The first, second and third counts alleged causes of action arising under N.J.Const. (1947), Art. I, par. I. The fourth and fifth counts sounded in contract, alleging that defendants' actions violated the terms of plaintiff's contract with Princeton University. The sixth count alleged a cause of action under the law of associations, claiming that defendants deviated from Princeton's own rules and regulations.
The seventh count alleged a cause of action under the Fifth and Fourteenth Amendments to the United States Constitution. *559 The eighth count alleged a cause of action under 42 U.S.C.A. § 1983.
The ninth and eleventh counts alleged causes of action sounding in defamation. The tenth count alleged a cause of action for intentional infliction of emotional harm. The twelfth count alleged a cause of action for invasion of privacy. The thirteenth count alleged a cause of action for malicious interference with plaintiff's prospective economic advantage, and the fourteenth count alleged a cause of action for malicious interference with plaintiff's contractual relationship.
Under all counts plaintiff sought actual and punitive damages, plus costs and attorneys' fees. Under the first through eighth counts plaintiff sought temporary and permanent injunctive relief, primarily (1) to require defendants to graduate her on June 8, 1982; (2) to restrain defendants from notifying any of the law schools to which she has applied of the disciplinary action taken against her, and (3) to require defendants to clear her record.
Defendants filed an answer denying the material allegations of the complaint and set forth separate defenses.
On April 22, 1982, at plaintiff's request, the trial judge entered an order permitting discovery with leave of court, which required defendants to produce documents and appear for depositions commencing Tuesday, April 27, 1982.
Plaintiff deposed defendant Sylvia Molloy (Professor Molloy), defendant Peter Onek (Dean Onek) (three sessions), defendant William G. Bowen (President Bowen) and Princeton University Athletic Director Robert Myslik. Defendants deposed plaintiff, Helene S. Napolitano (plaintiff's mother), Professor Hans Aarsleff and former Princeton coach Leonard Rivers.
After several procedural motions, including a motion by defendants to disqualify the trial judge (which he denied), and various conferences among counsel and the judge, the parties were directed to bring cross-motions for summary judgment on the following issues: (1) whether the New Jersey Constitution *560 imposes due process requirements on Princeton's disciplinary system; (2) whether the Faculty-Student Committee on Discipline applied the appropriate standard in finding plaintiff guilty of plagiarism; (3) whether there is a right to counsel in connection with disciplinary proceedings at a private university; (4) whether Princeton denied plaintiff a right to have certain witnesses speak on her behalf; (5) whether plaintiff was given adequate notice of her right to question Professor Molloy; (6) whether plaintiff violated Princeton's rules on plagiarism and (7) whether the penalty imposed on plaintiff breached an express or implied term of the "contract" between plaintiff and Princeton or her associational rights as a student at Princeton.
The first summary hearing was held on May 24, 1982. At that hearing both sides chose to present oral argument and to rely upon the written materials previously submitted to the court, including affidavits, depositions and numerous exhibits. Although the trial judge had clearly stated, on numerous prior occasions, that testimony could be presented, neither party chose to call any witnesses.
After hearing oral argument the trial judge decided to remand the matter for a rehearing at Princeton. He found that a conviction for the academic fraud offense of plagiarism must be based upon a finding of "intent to pass off the submitted work as the student's own." He also required that plaintiff be permitted to call "any witnesses she wished on her own behalf, subject only to reasonable regulation by the presiding officer." He rejected plaintiff's argument that she was entitled to be represented by counsel at the rehearing. He retained jurisdiction and scheduled a further hearing for June 2, 1982, 186 N.J. Super. 548.
The trial judge also directed counsel to prepare a set of instructions to the Faculty-Student Committee on Discipline, setting forth its responsibilities at the hearing. That document was prepared with the agreement of both counsel and presented to COD. The instructions provided, among other things: (1) the *561 Committee was to proceed in its usual manner, except as specifically set forth in the "charge"; (2) the Committee was free to reach the same or a different result; (3) plaintiff could call any witness, subject to "reasonable limitation in terms of numbers, length of presentation, and the like"; (4) the Committee was "not limited in any way to information presented at the earlier hearing"; (5) the decision was to "be based solely on the information presented at the rehearing"; (6) the entire proceedings, including deliberations, were to be tape-recorded and (7) the minutes or "summary" of the proceedings were to be prepared by the acting secretary and approved by each member of the Committee.
With respect to the COD's responsibilities in rehearing the accusation against plaintiff, the instructions provided, in full:
The Committee should first focus upon whether the offense of plagiarism has occurred. In so doing, it should determine whether there has been deliberate use of an outside source without proper acknowledgment. In this regard, "deliberate" means "intention to pass off the work as one's own." If the question of a penalty is reached, the Committee should then focus upon: (a) the seriousness of the offense that has been found to have been committed, (b) the character and accomplishments of the person who has committed the offense, (c) the penalties assigned in other cases, and (d) the purposes  including educative  of the penalty to be assigned in this matter.
At plaintiff's request, the trial judge directed that the documents which were submitted to him be made available to the Committee prior to the rehearing. They included: (1) plaintiff's three-volume appendix; (2) the complete transcripts of all depositions and (3) unannotated copies of the English translations of plaintiff's paper and the Ludmer text which had been Appendix B to defendants' brief.
The rehearing took place on May 27, 1982, commencing at 8 a.m. Plaintiff was accompanied into the hearing room by her chosen advisor, Professor Jameson W. Doig, who spoke on her behalf. The COD agreed to hear from plaintiff's five character witnesses, plus Professor Aarsleff but, as permitted by the court below and the instructions, it limited each witness's presentation to five minutes. This limitation, however, was not strictly followed.
*562 After hearing the opening and closing remark of Professor Doig, plaintiff's statement and the questioning of Professor Molloy, plaintiff and other witnesses, the COD excused plaintiff, her advisor and all of the witnesses in order to deliberate. The Committee unanimously found plaintiff guilty of plagiarism (8-0) and, with one abstention, imposed the penalty of withholding her degree for one year (7-1).
Dean Paulo Cucchi, who had replaced Dean Onek as the Secretary of the Committee for the purposes of the rehearing, prepared the summary of the hearing required by the instructions.
On May 30, 1982 plaintiff and Professor Doig met with President Bowen to discuss her appeal. Plaintiff's parents also met with President Bowen on that date. On June 1, 1982 President Bowen affirmed the decision reached by the COD at the rehearing.
The trial judge held a final summary hearing on June 2, 1982. After hearing the argument of counsel, he found that the decision on the remand was supported by the evidence. He stated that the "Committee's findings concerning intent are explicit and substantiated in the record as set forth in some detail on pages two and three of the summary of the hearing dated May 28, 1982"; that "there is no question from plaintiff's extensive use of unattributed material, that the committee was justified in concluding that she committed the offense with the intention to pass off the quoted material as her own." While he emphasized his personal disagreement with the severity of the penalty, he held that he could not find "that Princeton could not in good faith have assessed the penalties it did against plaintiff."
With this fairly detailed statement of the facts and proceedings before the University and the trial judge as a background, we proceed to a determination of the legal issues raised by plaintiff on this appeal.
*563 The principal issue, as we see it, is whether the trial judge properly viewed his role as limited to a determination of whether Princeton substantially complied with its own regulations in disciplining plaintiff and, if so, whether Princeton's decision was supported by the evidence adduced at the hearing, and whether the penalty imposed was within Princeton's authority to impose.
Plaintiff first argues that the trial judge committed reversible error by failing to provide her with a testimonial hearing and by granting defendants' motion for summary judgment and dismissal of the complaint "notwithstanding that material facts remain hotly in dispute." In her second argument, which is intertwined with the first, she claims that the trial judge's deference to defendants' factfinding and conclusions of law severely prejudiced her and constitutes reversible error.
Before discussing the merits of these controversies, we deem it important to clear the record of some confusion which we observe with respect to the offense with which plaintiff was charged. Plaintiff seems to contend that she has been disciplined for misconduct in the University and that the penalty imposed was the result of this misconduct. We believe that the infraction for which plaintiff was penalized constituted an academic offense under University regulations and therefore must be considered in the light of an academic disciplinary action on the part of the University authorities. It is clear that plaintiff was charged with plagiarism  in other words, that plaintiff attempted to pass off as her own work, the work of another. That act, if proven, constituted academic fraud. We do not view this case as involving an appeal from a finding of general misconduct; instead, we are concerned with the application of academic standards by the authorities at Princeton.
In pursuing the arguments mentioned above plaintiff points to "several crucial matters [which] remained hotly disputed." Did she commit plagiarism? Was the penalty fair and/or consistent with penalties imposed by defendants in "similar" cases (and thereby within the parties' contract)? And, did the penalty *564 serve an educative purpose and thereby come within the scope of the parties' bargain?
Plaintiff complains that the trial judge gave total deference to the results of the second hearing at the University and thereby abdicated his role as a Chancery Division judge. Contrary to plaintiff's contentions, the trial judge did not determine his role in reviewing the proceedings before the University and the penalty without recourse to authority. In the opinion he filed after the proceedings there may be found citation to several cases dealing with academic discipline and the role that courts should play in dealing with the rights of students vis-a-vis the university in which they are enrolled. Because of the lack of precedent in this jurisdiction, he referred to our law of private associations, as set forth in Higgins v. American Society of Clinical Pathologists, 51 N.J. 191 (1968). He also noted the comprehensive opinion filed by Judge Ackerman in the United States District Court in Clayton v. Princeton University, 519 F. Supp. 802 (D.N.J. 1981).
In Higgins v. American Society of Clinical Pathologists Justice Proctor, speaking for the court, described the relationship between a private organization and one of its members, and the rights of each, in the following terms:
While the general rule is that courts will not compel admission of an individual into a voluntary association, they have been willing to intervene and compel the reinstatement of a member who has been wrongfully expelled: "The law accords important rights and status to members of voluntary organizations not extended to mere aspirants to membership therein...."
The rights accorded to members of an association traditionally have been analyzed either in terms of property interests  that is, some interest in the assets of the organization, ... or in terms of contract rights  that is, reciprocal rights and duties laid down in the constitution and bylaws, . .. . These theories, however, are incomplete since they often prevent the courts from considering the genuine reasons for and against relief ... and have been extensively criticized. See, e.g., Note, Judicial Control of Actions of Private Associations, 76 Harv.L. Rev. 983, pp. 998-1002 (1963); Note, 15 Rutgers L.Rev. 327, pp. 330-333 (1960). Leading commentators have pointed out that the real reason for judicial relief against wrongful expulsion is the protection of the member's valuable personal relationship to the association and the status conferred by that relationship.... As Professor Chafee has noted, "the wrong is a tort, not a breach of contract, *565 and the tort consists in the destruction of the relation rather than in a deprivation of the remote and conjectural right to receive property." ... The loss of status resulting from the destruction of one's relationship to a professional organization ofttimes may be more harmful than a loss of property or contractual rights and properly may be the subject of judicial protection...
... Certification of the plaintiff by ASCP conferred upon her the standing of a competent professional. Her membership in this professional society gave her recognition and status, two important elements of professional success.... According to the defendant's pamphlet, quoted earlier in this opinion, the Registry "has elevated the status of the medical laboratory worker to a high professional level." From the record it is clear that the designation M.T. (ASCP) is the hallmark of competence in the field of medical technology. Plaintiff's status as a certificate holder imparts a certain cachet which distinguishes her from those noncertified laboratory workers who presumably are not as well trained or well qualified as is the plaintiff...
... In determining whether the deprivation of plaintiff's status was justified, our examination of the reason for her expulsion must be limited. Courts ordinarily ought not to intrude upon areas of associational decision involving specialized knowledge.... Private associations must have considerable latitude in rule-making in order to accomplish their objectives and their private law generally is binding on those who wish to remain members. However, courts will relieve against any expulsion based on rules which are in conflict with public policy.... [51 N.J. at 199-202; citations omitted]
We do not believe, however, that the law of private associations delineates completely the relationship between a student and a university. The relationship is unique. The status of a private university such as Princeton was referred to by Justice Handler in his opinion for the court in State v. Schmid, 84 N.J. 535 (1980), in these terms:
A private educational institution such as Princeton University involves essentially voluntary relationships between and among the institution and its students, faculty, employees, and other affiliated personnel, and the life and activities of the individual members of this community are directed and shaped by their shared educational goals and the institution's educational policies. [at 552]
The student comes to the academic community (the university) seeking to be educated in a given discipline. The student pays a tuition which might, in some instances, represent a contractual consideration. The university undertakes to educate that student through its faculty and through the association of other students with that student and the faculty. Transcending that bare relationship is the understanding that the student will abide by the reasonable regulations, both academic and disciplinary, *566 that the student will meet the academic standards established by the faculty and that the university, on the successful completion of studies, will award the degree sought to the student. Such a relationship, we submit, cannot be described either in pure contractual or associational terms. In those instances where courts have dealt with the relationship of a private university to its students in contractual terms, they have warned against a rigid application of the law of contracts to students' disciplinary proceedings. Thus, in Slaughter v. Brigham Young Univ., 514 F.2d 622 (10 Cir.1975), it was held:
It is apparent that some elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the University to provide some framework into which to put the problem of expulsion for disciplinary reasons. This does not mean that "contract law" must be rigidly applied in all its aspects, nor is it so applied even when the contract analogy is extensively adopted. There are other areas of the law which are also used by courts and writers to provide elements of such a framework. These included in times past parens patriae, and now include private associations such as church membership, union membership, professional societies; elements drawn from "status" theory, and others. Many sources have been used in this process, and combinations thereof, and in none is it assumed or required that all the elements of a particular doctrine be applied. The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category. It may also be different at different schools. There has been much published by legal writers advocating the adoption of various categories to be applied to the relationship. See 72 Yale L.J. 1387; 48 Indiana L.J. 253; 26 Stanford L.Rev. 95; 38 Notre Dame Lawyer 174. There are also many cases which refer to a contractual relationship existing between the student and the university, especially private schools. See Carr v. St. John's University, 17 A.D.2d 632, 231 N.Y.S.2d 410; University of Miami v. Militana, 184 So.2d 701 (Fla.App.); Zumbrun v. University of Southern California, 25 Cal. App.3d 1, 101 Cal. Rptr. 499; Drucker v. New York University, 59 Misc.2d 789, 300 N.Y.S.2d 749. But again, these cases do not adopt all commercial contract law by their use of certain elements. [at 626]
Similar language may be found in Lyons v. Salve Regina College, 565 F.2d 200, 202 (1 Cir.1977), cert. den. 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1977); Jansen v. Emory Univ., 440 F. Supp. 1060, 1062 (N.D.Ga. 1977), aff'd 579 F.2d 45 (5 Cir.1978). These cases, while recognizing the rights of students, emphasize the independence that should be accorded to a university to permit it to exercise properly educational responsibility.
*567 In State v. Schmid, 84 N.J. at 543, a case involving Princeton University, although in a different milieu, it was noted:
... [P]ublic colleges and universities, as instrumentalities of state government, are not beyond the reach of the First Amendment.... A public college or university, created or controlled by the state itself, is an arm of state government and, thus, by definition, implicates state action ...
A private college or university, however, stands upon a different footing in relationship to the state. Such an institution is not the creature or instrument of state government.... Hence, the state nexus requirement that triggers the application of the First Amendment is not readily met in the case of a private educational institution ...
........
Princeton University is, indisputably, predominantly private, unregulated and autonomous in its character and functioning as an institution of higher education. [at 548]
And:
... [W]e must give substantial deference to the importance of institutional integrity and independence. Private educational institutions perform an essential social function and have a fundamental responsibility to assure the academic and general well being of their communities of students, teachers and related personnel. At a minimum, these needs, implicating academic freedom and development, justify an educational institution in controlling those who seek to enter its domain. The singular need to achieve essential educational goals and regulate activities that impact upon these efforts has been acknowledged even with respect to public educational institutions.... Hence, private colleges and universities must be accorded a generous measure of autonomy and self governance if they are to fulfill their paramount role as vehicles of education and enlightenment .... [at 566-567; citations and footnote omitted]
Courts have also recognized the necessity for independence of a university in dealing with the academic failures, transgressions or problems of a student. We have noted heretofore that we regard the problem before the court as one involving academic standards and not a case of violation of rules of conduct. Plaintiff, apparently ignoring the distinction, seeks a full panoply of procedural safeguards under a claim of due process.
Courts have been virtually unanimous in rejecting students' claims for due process in the constitutional sense where academic suspensions or dismissal are involved. See Slaughter v. Brigham Young Univ., 514 F.2d at 625; Jansen v. Emory Univ., 440 F. Supp. at 1062; Lyons v. Salve Regina College, 565 F.2d at *568 202-203; Mahavongsanan v. Hall, 529 F.2d 448, 449-450 (5 Cir.1976); Kwiatkowski v. Ithaca College, 82 Misc.2d 43, 368 N.Y.S.2d 973, 976-977 (Sup.Ct. 1975); Tedeschi v. Wagner College, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302, 1304 (Ct.App. 1980). But cf. Greenhill v. Bailey, 519 F.2d 5 (8 Cir.1975) (where academic dismissal of a medical student was accompanied by notice to the committee of Association of Medical Schools that the student lacked "intellectual ability" or had insufficiently prepared his course work, the student was deprived of a significant interest in liberty in that it made it improbable that he would be able to pursue his medical education elsewhere. While courts will ordinarily defer to broad discretion vested in public school officials and will rarely review an educational institution's evaluation of academic performance, judicial intervention is required when a state educational institution acts to deprive an individual of a significant interest in either liberty or property). Compare the foregoing cases with Sill v. Pennsylvania State Univ., 462 F.2d 463 (3 Cir.1975), and Ryan v. Hofstra Univ., 67 Misc.2d 651, 324 N.Y.S.2d 964 (Sup.Ct. 1971). Both of the latter cases involved disciplinary proceedings arising out of breaches of conduct contrary to university regulations.
In Board of Curators, Univ. of Mo. v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Supreme Court was faced with a situation where a last-year medical student was dropped from the school because of unsatisfactory performance. The student had been advanced to her final year of medical school on a probationary basis after being informed by letters from, or in meetings with, the dean of the medical school of faculty's dissatisfaction with her clinical performance, and of a recommendation that she be dropped from the school unless there was radical improvement in her clinical competence, peer and patient relations, personal hygiene and ability to accept criticism. The court unanimously found that assuming the existence of a liberty or property interest, the student had been awarded at least as much due process as the Fourteenth Amendment required *569 since she had been fully informed of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment, and since the ultimate decision to dismiss the student was careful and deliberate. A majority of the court found that because the dismissal of a student for failure to meet academic standards calls for far less stringent procedural requirements than the violation of valid procedural rules of conduct, the due process clause of the Fourteenth Amendment did not require a hearing when the state medical school dismissed a student for academic cause. In reaching its conclusion with respect to the second issue mentioned, that is, with respect to the difference between a failure of a student to meet academic standards and the violation by a student of valid rules of conduct, the majority made the following observations:
Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires. The school fully informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment. The ultimate decision to dismiss respondent was careful and deliberate. These procedures were sufficient under the Due Process Clause of the Fourteenth Amendment....
The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal. .. .
........
Reason, furthermore, clearly supports the perception of these decisions. A school is an academic institution, not a courtroom or administrative hearing room ...
Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement ... Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision-making.
... The educational process is not by nature adversary; instead it centers around a continuing relationship between faculty and students, "one in which the teacher must occupy many roles  educator, adviser, friend, and, at times, *570 parent-substitute." ... We decline to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship. We recognize, as did the Massachusetts Supreme Judicial Court over 60 years ago, that a hearing may be "useless or harmful in finding out the truth as to scholarship...." [435 U.S. at 85-86, 88-89, 98 S.Ct. at 952-953, 954; footnotes and citations omitted]
Considering Princeton's status as a private university under our law, State v. Schmid, we believe that the principles set forth in the cases cited above, culminating with Board of Curators, Univ. of Mo. v. Horowitz, accurately state our law with respect to the proceedings here under review. We agree with the trial judge that he should not have become a super-trier under due process considerations.
In support of our conclusion we note that deference has always been afforded to the internal decision-making process under our law of associations. In Higgins v. American Society of Clinical Pathologists, 51 N.J. at 202, our Supreme Court held that the members of an association are generally bound by its private law. To the same effect is Calabrese v. Policemen's Benev. Ass'n, Local No. 76, 157 N.J. Super. 139, 146-147 (Law Div. 1978). Baugh v. Thomas, 56 N.J. 203 (1970), and Zelenka v. B.P.O.E. of the U.S., 129 N.J. Super. 379 (App.Div. 1974), both relied on by plaintiff here, are not to the contrary.
Plaintiff persists, however, in her contention that the charge of plagiarism against her was not proved by the University before the COD and that the trial judge should have conducted a full hearing on the substantive offense. No authority is cited to us to support this view, and we know of none. The trial judge was required to review the evidence before the COD and to determine whether the evidence presented was sufficient to support the charge of plagiarism. He concluded, regardless whether he found the evidence sufficient, substantial or under any standard of evidence required, that the charge of plagiarism against plaintiff was proved. Having reached this conclusion, his task was completed. He was not obliged to conduct a full-fledged hearing on that substantive issue. As was stated in Slaughter v. Brigham Young Univ., supra:

*571 When the courts lay down requirements for procedural due process in these situations as required by the Constitution, and when the school administrators follow such requirements (and other basic conditions are met), some weight must then be given to their determination of the facts when there is substantial evidence to support it. Thus if the regulations concerned are reasonable; if they are known to the student or should have been; if the proceedings are before the appropriate persons with authority to act, to find facts, or to make recommendations; and if procedural due process was accorded the student, then the findings when supported by substantial evidence must be accorded some presumption of correctness. The adequacy of the procedure plus the substantial evidence element constitute the basis and the record to test whether the action was arbitrary. The fact-finding procedures were adequate. [514 F.2d at 625]
Our independent examination of the record satisfies us that the COD properly concluded that plaintiff had plagiarized. Her paper constitutes a mosaic of the Ludmer work in an attempt to pass off Ludmer's ideas as plaintiff's own. While plaintiff persists in her argument that she did not intend to plagiarize and that there is nothing in the proofs to show that she did so intend, the mosaic itself is the loudest argument against her. The creation of that mosaic can only lead to one conclusion: that plaintiff intended to deceive her preceptor that the paper was original. An excerpt from the summary prepared by the COD with respect to the basis of its finding of intent is illuminating:
A series of questions and comments concerning the contents of the paper followed Ms. Napolitano's presentation. It was pointed out that the entire paper consisted almost exclusively of a literal or slightly paraphrased rendering of various portions of the one secondary source used, without proper attribution, except in occasional instances. In addition, Professor Molloy and some members of the Committee mentioned a number of points in the paper which at the very least suggested that Ms. Napolitano did indeed intend to give the impression that the borrowings from her source were in fact her own. Among these were:
1) A few statements from the source had been put in quotation marks but not the rest. This could indicate, on the other hand, that Ms. Napolitano had made an effort to use outside sources and, on the other, that the portions of the paper that were not in direct quotations were her own work.
2) The use, in the paper, of phrases such as "it is evident that," "it is important to note that," "one can assume that," etc. suggests that what follows is Ms. Napolitano's own thoughts and words, when in fact, in virtually all instances, what follows is words borrowed from the one source without attributions.
3) In several instances, there are quotes from the novel which is the subject of the paper. These quotes were used by the secondary source [the Ludmer text] *572 to illustrate various points. In making these same points (usually using the words of the secondary source), Ms. Napolitano used the same quotes but changed the page numbers of the quotes to correspond to the edition of the novel used in the course. This gives the appearance that Ms. Napolitano had found the quotes herself in the novel, which, in fact, she did not.
4) The verb tenses in the material borrowed from the source were all changed to the present tense for the sake of consistency in the paper.
5) Small words and phrases from the borrowed source were deleted in cases where these words may have seemed too technical or awkward.
The COD did not accept plaintiff's explanations, finding them unsatisfactory, especially in light of the signed statement at the conclusion of the paper that it was her work in accordance with University regulations.
Plaintiff next argues that defendants denied her liberty and property interests without due process of law under N.J. Const. (1947), Art. I, par. 1. Plaintiff's argument under this point is buttressed principally by the holding of our Supreme Court in State v. Schmid. In Schmid defendant was convicted of criminal trespass based upon his distribution of political leaflets on the Princeton University campus. Schmid appealed his conviction on federal and state constitutional grounds. Plaintiff relies principally on an observation made by Justice Handler: "On numerous occasions our own courts have recognized the New Jersey Constitution to be an alternative and independent source of individual rights...." 84 N.J. at 555.
However, Schmid does not stand for the proposition advanced by plaintiff. Schmid's conviction was overturned by the Supreme Court because it was found that Princeton's regulations governing the distribution of literature and the promulgation of speech on the campus did not contain adequate standards. The arrest of Schmid for distribution, therefore, was arbitrary and, in the face of that finding, the conviction could not stand. This is a far cry from the argument that the New Jersey Constitution requires Princeton to grant its academic students due process rights not accorded to them under the federal constitution. We reject the argument.
*573 Plaintiff's final argument relates to the penalty which was imposed upon her, the postponement of her degree for a period of one year until June 1983. The question of the penalty was troublesome to the trial judge. From the very institution of this action until the time he rendered his final decision, the judge expressed personal disagreement with the decision of the COD and President Bowen to defer the granting of plaintiff's degree from June 1982 until June 1983. Despite that disagreement the judge correctly held that he could not substitute his own views for those of a duly constituted administrative body within a private institution. He reached this conclusion and the holding as to the correctness of the penalty on the basis of the law of contracts. Plaintiff persists in arguing, however, that the penalty imposed demonstrates bias on the part of defendants because (a) the penalty imposed is inconsistent with penalties imposed in similar cases over the years and (b) it is actually "out of line" with the offense with which she was charged. We reject these arguments with the following observations.
Defendants in their brief describe plaintiff as maintaining a "strong" academic record at the University. In the first count of her complaint, describing her own activities and successes at the University plaintiff pleaded as follows:
Gabrielle Napolitano entered Princeton in September, 1978. She had been recruited out of Stamford, Connecticut High School, where she had earned a reputation as the top scholar-athlete (male or female) in the school.
Ms. Napolitano was scheduled to participate on the University's women's basketball team, but during freshman week in 1978 she severely injured her knee. Extensive surgery and rehabilitation followed. Nonetheless, plaintiff attempted to come back to the team during her sophomore year, but after enduring rigorous double sessions without complaint and before the team was selected, recognized that her physical limitations prevented her from playing.
In place of active athletic participation, Ms. Napolitano thereafter devoted herself to team management and paper work, and other support services for the basketball team, the men's varsity baseball team, the University's Athletic Department, and the University's Sports Information services. She has been deemed by the educators, coaches, administrators and students for whom and with whom she labored in this way for more than three years, as (among other things): a) "... one of the finest young women I've ever had the opportunity of meeting ..."; b) ... (the individual whose) day-in and day-out integrity and personal honesty are traits that no other student, either at Princeton or at *574 Michigan, has matched"; c) "... one of the finest, if not the finest, student I have known"; d) "... (the student who when compared) with other students whom I have known during my eight years of student affairs work, is truly one of the most outstanding people whom I have encountered"; e) "... without doubt the finest student I have worked with ... she has never fallen short of fulfilling any of her obligations ..."; f) "... a name that is highly respected and admired on the Princeton University campus ... (who in the field of sports information) has done the best job I've ever seen ... (and who) is a bright, sensitive young woman with a very promising future ..."; and h) "... a girl of impeccable character and reputation ... (s)he is our best ... (a person who) contains star qualities as a human being that many would envy...."
Likewise, plaintiff has been described time and again as incapable of deceit; honest; possessing "solid principles"; of great integrity; "innocent and naive"; "open and forthright"; possessing "deep concern for her fellow man, (and) always ready to offer assistance when needed ..."; perservering; loyal; "incapable of intentionally committing the act of plagiarism"; and "forthrighteous and conscientious."
In a written testimonial to plaintiff directed in this case to the Committee, the University's Assistant to the Director of Sports Information stated,
"I only wish each one of you could know Gabby (plaintiff) as I know her. The world is a better place because of people like Gabby."
Ms. Napolitano's faculty advisor for her junior thesis  Professor Hans Aarsleff  has sworn in a certified statement that plaintiff is among the finest students he has known in thirty years of teaching at the university level (including twenty-six (26) years at Princeton), and that the quality of her work, thought preparedness and reliability have been of the highest caliber.
Complementing her extra curricular work at Princeton, Ms. Napolitano substantially completed her degree requirements in three years. Further, except for medical reasons related to her knee injury, plaintiff missed only three (3) classes in her four year tenure at Princeton.
Ms. Napolitano's cumulative departmental Grade Point Average ("G.P.A.") is approximately 3.8. Her overall cumulative G.P.A. is approximately 3.7. The highest attainable G.P.A. is 4.0.
As a result of her special qualities and achievements at the University, plaintiff had been considered as a nominee for a Rhodes Scholarship.
It must be apparent that everyone involved in this action regarded plaintiff as a somewhat gifted if not unusual student of high achievement. She had obviously earned her place in the University community by her achievements. Under those circumstances should not the community of Princeton University have been entitled to expect more of plaintiff? Should not the reaction of a University community such as that at Princeton been one of dismay? We merely pose these questions. We do not answer them. We pose them principally because of plaintiff's *575 persistent complaints that the University did not "prove" that she was a plagiarist, especially in the face of her continued denials of plagiarism or the intent to deceive Professor Molloy. It is apparent to us that plaintiff has neglected to view her position in the university community and the effect that the charges against her have had on the entire community.
Viewed in this light, we find little purpose in reviewing plaintiff's argument which attempts to demonstrate that in 20 or more disciplinary cases arising out of the same or similar incidents the individuals there involved were not penalized as severely as she was. To us this is totally irrelevant. Each penalty obviously must be tailored to the offense committed, and the offense committed must be viewed with regard to the offender and the community. We believe it is readily ascertainable that the University softened the penalty because of the status that plaintiff had attained in the University community and the fact that she had never transgressed any of the University regulations before. Recall that this incident occurred at the beginning of the second semester. Precedent would permit the COD and the President to have imposed a penalty of suspension for the entire second semester, with the result that plaintiff would have had to repeat that semester during the winter and spring of 1983 at the additional expense of another tuition. Under the penalty imposed, plaintiff was permitted to continue her work and complete her requirements for her degree. Her penalty was that the degree was not awarded to her and will not be until June 1983. We find nothing unreasonable in this determination.
One last observation. Plaintiff claims that the penalty is supposed to provide something educative in its imposition. She argues that the penalty here is improper because there is no educational value to be found in it. Perhaps plaintiff's self-concern blinds her to the fact that the penalty imposed on her, as a leader of the University community, has to have some educative effect on other student members of the community. In addition, to paraphrase the poet, "the child is mother to the woman," we believe that the lesson to be learned here should be learned *576 by Gabrielle Napolitano and borne by her for the rest of her life. We are sure it will strengthen her in her resolve to become a success in whatever endeavor she chooses.
The judgment of the Chancery Division is affirmed, with no costs to any party.