719 A.2d 693 (1998)
316 N.J. Super. 83
Kaushik MITTRA, Plaintiff-Appellant,
v.
UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, Dr. Richard N. Buchanan, Dr. Paul J. Desjardins, Dr. Ival McDermott, Defendants-Respondents, and
John Doe 1-20, Jane Doe 1-20, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1998.
Decided November 6, 1998.
*694 Silvana D. Raso, Englwd Cliffs, for plaintiff-appellant (Schepisi & McLaughlin, attorneys; Ms. Raso, on the brief).
Bindi S. Chandarana, Deputy Attorney General, for defendants-respondents (Peter Verniero, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Chandarana, on the brief).
Before Judges BAIME, CONLEY and A.A. RODRIGUEZ.[1]
The opinion of the court was delivered by BAIME, P.J.A.D.
Plaintiff appeals from a summary judgment dismissing his claims against the University of Medicine and Dentistry of New Jersey (UMDNJ) and several of its administrators and employees. At issue is whether a university's dissemination of a handbook outlining its pupil performance evaluation process creates a contractual relationship between the school and its students in the context of a dismissal for academic reasons. We hold that the relationship between the university and its students should not be analyzed in purely contractual terms. As long as the student is afforded reasonable notice and a fair hearing in general conformity with the institution's rules and regulations, we defer to the university's broad discretion in its evaluation of academic performance.

*695 I.
Plaintiff, a former dental student, brought this action against UMDNJ and individual administrators and employees seeking a declaratory judgment and monetary damages. All of plaintiff's claims were grounded in the contention that UMDNJ improperly dismissed him for academic reasons. In the first three counts of his complaint, plaintiff asserted that defendants breached the provisions of the 1995-1997 Dental Student Handbook which, he alleged, constituted a contract between UMDNJ and its students. In other counts, plaintiff alleged conspiracy, interference with prospective economic advantage, and intentional and malicious tortious misconduct. The Law Division granted defendants' motion for summary judgment without hearing argument. Plaintiff moved for reconsideration, contending that he had been misinformed of the scheduled argument date and was not afforded the opportunity to file opposing papers. Plaintiff's motion was granted, and the matter was fully briefed and argued. The Law Division again granted summary judgment, finding that there was no genuine issue of material fact and that defendants were entitled to judgment as a matter of law.
The essential facts are not in dispute. Plaintiff was enrolled in the dental school's five year program. This program requires the student to complete the first two years of the curriculum in three years. The student must then complete his "junior" and "senior" years in the remaining two years.
UMDNJ customarily issued a student handbook. The 1995-1997 Dental Student Handbook contained a section or chapter describing the institution's student evaluation process. Under the applicable guidelines, the Student Academic Performance Committee (SAPC) was charged with the responsibility of determining whether students satisfied appropriate academic performance levels. In the event of inadequate performance, the SAPC had discretion to (1) permit remediation of a D or F grade, (2) place the student on academic probation, (3) issue an academic warning, (4) allow the student to repeat the academic year, (5) recommend dismissal of a student, (6) promote the student notwithstanding his poor academic performance, or (7) take other actions that are not relevant to this appeal.
The procedures dealing with the dismissal of a student were specifically set forth in the handbook. The SAPC had the authority to recommend to the Associate Dean of Academic Affairs that a student be dismissed. The SAPC could make such a recommendation only upon a finding that the "student's overall academic or professional performance warrant[ed] dismissal or when the student's completion of failed courses [could] not be accomplished within the required five academic years." Although the record is unclear, it appears that the SAPC was to make such a determination in the form of an initial decision, from which the student could appeal. In the event that the SAPC sustained its initial decision, the student could seek review from the Executive Council. Apparently, the Executive Council had the final authority to dismiss a student for poor academic performance. At various stages of the process, the student had the right to an attorney and a faculty advocate.
At the time of his dismissal, plaintiff was in his fourth year. However, his academic record was poor. In his third year, plaintiff had received one F grade and two D grades. Because his grades were unsatisfactory, the SAPC recommended plaintiff's dismissal. The Executive Council refused to adopt the SAPC's recommendation, and instead directed plaintiff to remediate his grades during a six week summer remediation program. Plaintiff successfully remediated his grades during the summer months of 1995 and was promoted to his fourth, or junior, year.
Plaintiff's academic performance in the fourth year clinical program was abysmal. By a letter dated November 6, 1995, Dr. Paul Desjardins, the Associate Dean of Academic Affairs, apprised plaintiff of his unsatisfactory performance in seven classes. Desjardins advised plaintiff of the existence of several tutorial programs that offered opportunities for improvement. On the next day, Dr. Ival McDermott, the Group Practice Administrator in charge of the clinical program, sent plaintiff a memorandum requesting an appointment to discuss the student's poor performance, *696 excessive patient cancellations and lack of productivity. In a separate memorandum sent to Desjardins, McDermott acknowledged that plaintiff had missed the clinical program's orientation classes because he was engaged in his remediation courses over the summer months. McDermott emphasized, however, that plaintiff's poor performance pertained to other problems. These problems included plaintiff's ignorance of very elementary procedures and principlesmatters that should have been learned early on in the dental school program. In a subsequent letter to plaintiff, McDermott advised him of his unsatisfactory grade in patient care and management. McDermott noted that plaintiff's failing grade was the result of excessive cancellations, patient complaints of slow progress and plaintiff's failure to adhere to sound infection control procedures.
On January 16, 1996, the SAPC met to consider plaintiff's poor academic and clinical performance. Plaintiff had received an F in one course, unsatisfactory grades in three others, and had an unsatisfactory performance in four clinical departments. In its initial decision, the SAPC recommended plaintiff's dismissal.
On January 22, 1996, the SAPC assembled to consider plaintiff's appeal. Plaintiff did not attend, apparently because he found the hearing date "inconvenient." We need not describe in detail the substantial evidence of plaintiff's poor performance considered by the Committee. Suffice it to say, the SAPC determined that it would be virtually impossible for plaintiff to satisfactorily complete the dental school's curriculum requirements within the five years mandated by the program.
On February 7, 1996, the Executive Council heard plaintiff's appeal. We again perceive no need to recount the proceedings in detail. Led by the Dean of the dental school, Dr. Richard Buchanan, the Council reviewed plaintiff's failing grades and inadequate performance, as summarized by Dr. Desjardins. Desjardins was excused from the meeting after his presentation. Plaintiff, assisted by his attorney and faculty advisor, offered explanations for his poor academic and clinical performance. The Council then rendered its decision dismissing plaintiff from the student body. In its decision, the Council emphasized the importance of detecting professional incompetence and unsatisfactory performance at an early stage. The Council observed that plaintiff was far behind in his course work and that substantial counseling efforts had proved unavailing. In a nine to four vote, the Council sustained the SAPC's recommendation of dismissal.

II.
We first address plaintiff's argument that UMDNJ's dissemination of the student handbook created a binding and enforceable contract. As phrased in his complaint, plaintiff asserts that the handbook contained an "implied warranty," fully enforceable by the courts. While plaintiff does not define with exactitude the rights that allegedly flowed from this warranty, it is arguable that if a contract existed, the courts would have the plenary authority to make de novo findings and conclusions in examining UMDNJ's actions and would owe no particular deference to the institution's decisions in that respect.
We considered a somewhat related question in Napolitano v. Trustees of Princeton Univ., 186 N.J.Super. 548, 453 A.2d 263 (App.Div.1982). There, the plaintiff, a student at Princeton University, brought suit to overturn the University's disciplinary decision withholding her degree for one year for academic fraud. Among other claims, the plaintiff contended that the penalty imposed by the University constituted a breach of contract. The plaintiff appealed after the Chancery Division upheld the penalty. In affirming the Chancery Division's judgment, we said that the relationship between a private university and its students can not be described either in pure contract or associational terms. Id. at 566, 453 A.2d 263. We observed that a student "comes to the ... university ... to be educated in a given discipline," and "pays a tuition which might, in some instances, represent a contractual consideration." Id. at 565, 453 A.2d 263. We nevertheless emphasized the "necessity for independence of a university in dealing with the academic failures, transgressions or problems of a student." Id. at 567, 453 A.2d *697 263. We held that the role of the courts in resolving disputes involving the dismissal of a student for academic reasons was limited to a determination whether the university complied with its own regulations and whether the institution's decision was supported by the evidence. See id. at 563, 453 A.2d 263.
Napolitano is the only reported New Jersey opinion dealing with the precise question whether contract principles should be applied in resolving disputes involving student dismissals for academic reasons. While the Law Division in Beukas v. Board of Trustees of Fairleigh Dickinson Univ., 255 N.J.Super. 552, 605 A.2d 776 (Law Div.1991), aff'd, 255 N.J.Super. 420, 605 A.2d 708 (App.Div.1992), applied quasi-contract principles in deciding whether a university could administratively terminate a college or program for financial reasons, the court took pains to distinguish that issue from questions pertaining to student dismissals for poor academic performance. Id. at 561, 605 A.2d 776.
Our decision in Napolitano was rendered in 1982. We did not have the benefit of subsequent opinions by the Supreme Court holding that "[a]n employment manual providing terms and conditions of employment... includ[ing] grounds and procedures for dismissal can create an employment contract." Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 392, 643 A.2d 546 (1994); see also Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 297, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985). We nevertheless adhere to our holding in Napolitano rejecting the rigid application of contractual principles to university-student conflicts involving academic performance and limiting our scope of review to a determination whether the procedures followed were in accordance with the institution's rules and regulations.
The key consideration in determining that an "employment manual gives rise to contractual obligations is the reasonable expectations of the employees." Witkowski v. Thomas J. Lipton, Inc., 136 N.J. at 392, 643 A.2d 546. The definiteness and comprehensiveness of an employment manual may lead an employee to reasonably understand that he has employment rights which are fully enforceable in the courts. On the basis of an employment manual, an employee might reasonably expect that he will be judged by his job performance and that his right to continued employment "can be cut off only `for good cause,' fairly determined." Woolley v. Hoffmann-La Roche, Inc., 99 N.J. at 300, 491 A.2d 1257. The standard of "good cause" is one with which the courts are intimately familiar.
Evaluation of student academic performance is a murkier subject. Academic evaluations of a student bear little resemblance to the type of inquiry traditionally performed by the courts. Similar to the decision of a professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons "requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision-making." Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124, 135 (1978). A graduate or professional school is surely the best judge of its student's academic performance and his ability to master the required curriculum. Id. at 85 n. 2, 98 S.Ct. at 953 n. 2, 55 L.Ed.2d at 132 n. 2. Rigid application of contract principles to controversies concerning student academic performance would tend to intrude upon academic freedom and to generate precisely the kind of disputes that the courts should be hesitant to resolve. Cf. Hernandez v. Overlook Hosp., 149 N.J. 68, 75-76, 692 A.2d 971 (1997); In re Univ. of Med. & Dentistry of N.J., 144 N.J. 511, 533-34, 677 A.2d 721 (1996); Dixon v. Rutgers, the State Univ. of N.J., 110 N.J. 432, 448-49, 541 A.2d 1046 (1988); Snitow v. Rutgers Univ., 103 N.J. 116, 122-23, 510 A.2d 1118 (1986); Swidryk v. Saint Michael's Med. Ctr., 201 N.J.Super. 601, 606, 493 A.2d 641 (Law Div.1985).
Students like plaintiff are not left unprotected. In the context of a teaching hospital's duty owed to a medical resident, our Supreme Court has said that the "institution[ ] must ... guaranty an academically terminated resident a `fair procedure.'" Hernandez v. Overlook Hosp., 149 N.J. at 81, 692 A.2d 971. In defining what constitutes a *698 fair procedure, the Court "include[d] the right to adequate notice of deficiencies, an opportunity to examine the evidence of those deficiencies used by the hospital to make its academic decision, and the right to present a case to the decision-making authority." Ibid. The Court observed that "[t]hose mandates not only accord great weight to the institution's judgment as to a resident's competence, but also insure that all of the relevant evidence is considered and protect against the risk of arbitrary or capricious decisionmaking." Id. at 81-82, 692 A.2d 971. Added to these protections is our holding in Napolitano that the courts may intervene where the institution violates in some substantial way its rules and regulations pertaining to student dismissals.
Our examination of the record discloses no sound basis for judicial intervention in this case. The procedures employed by UMDNJ in reviewing plaintiff's academic record comported with the mandates described in Hernandez. Moreover, plaintiff presented no evidence indicating that UMDNJ deviated in some significant way from its published rules and regulations. His mere, conclusory allegation in his complaint that appropriate procedures were not followed was insufficient to withstand summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529, 666 A.2d 146 (1995). While discovery had not been completed at the time the Law Division granted summary judgment, plaintiff failed to identify any specific rule or regulation that was violated by UMDNJ in dismissing plaintiff for academic reasons. The Law Division correctly dismissed plaintiff's claims for breach of contract.

III.
Plaintiff's tort claims do not require extended discussion. The Law Division properly granted summary judgment in defendant's favor.
As a preliminary matter, UMDNJ, as "a body corporate and politic" within the Department of Higher Education, N.J.S.A. 18A:64G-3, is a public entity subject to the notice requirements of the Tort Claims Act. Fuchilla v. Layman, 109 N.J. 319, 330-31, 537 A.2d 652, cert. denied sub nom. Univ. of Med. & Dentistry of N.J. v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Plaintiff was thus required to file a notice of claim within ninety days after accrual of his cause of action. N.J.S.A. 59:8-8. No evidence was presented that plaintiff sent the requisite notice by certified mail. N.J.S.A. 59:8-10. Nor was evidence presented that the requisite notice was delivered. Ibid. Notice which is neither delivered nor mailed by certified mail fails to comply with the statute, and there is no presumption of receipt on mailing by ordinary mail. Zois v. New Jersey Sports & Exposition Auth., 286 N.J.Super. 670, 673, 670 A.2d 92 (App.Div. 1996); Hammond v. City of Paterson, 145 N.J.Super. 452, 455, 368 A.2d 373 (App.Div. 1976); Margolis and Novack, Claims Against Public Entities, comment to N.J.S.A. 59:8-10 (1997). The certification by plaintiff's trial attorney that he was "fully familiar" with the requirements of filing claims against public entities and knew of "no reason" for him not to have mailed a notice of claim was not sufficient to defeat defendants' motion for summary judgment.
In any event, all of plaintiff's tort claims hinged upon his allegation that UMDNJ breached a contractual provision or violated a rule or regulation. Granting plaintiff the benefit of all favorable evidence and legitimate inferences, defendants were entitled to judgment as a matter of law.

IV.
At oral argument, after the Law Division granted defendants' motion for summary judgment, plaintiff requested permission to amend his complaint to allege a violation of the Law Against Discrimination. No formal motion papers were submitted, and no reason was cited for the delay in bringing this claim. The Law Division denied plaintiff's motion. Plaintiff argues that the court erred by refusing to permit the proposed amendment. We find no abuse of discretion. Interchange State Bank v. Rinaldi, 303 N.J.Super. 239, *699 256-57, 696 A.2d 744 (App.Div.1997); R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Judge Rodriguez did not participate in oral argument. However, the parties consented to his participation in the decision subsequent to argument.