875 A.2d 1043 (2005)
378 N.J. Super. 384
Anthony ROMEO, individually and on behalf of himself and student applicants for "TRUTH," a gay and lesbian student organization denied Provisional Recognition by Seton Hall University, Plaintiff-Respondent,
v.
SETON HALL UNIVERSITY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 2005.
Decided June 22, 2005.
*1044 Marc D. Haefner, Roseland, argued the cause for appellant (Connell Foley, attorneys; Mr. Haefner, of counsel; Dania M. Billings, on the brief).
Thomas D. Shanahan argued the cause for respondent (Shanahan & Associates and Marianne F. Auriemma, attorneys; Mr. Shanahan and Ms. Auriemma, on the brief).
Before Judges PETRELLA, YANNOTTI and BILDER.
The opinion of the court was delivered by
PETRELLA, P.J.A.D.
Defendant Seton Hall University appeals, on leave granted, from an order of the Law Division, which reinstated the complaint of plaintiff Anthony Romeo and vacated an earlier summary judgment order of dismissal for failure to state a claim.
On appeal, Seton Hall argues: (1) its motion to dismiss should have been granted as a matter of law; (2) dismissal of Romeo's claims under the Law Against Discrimination (LAD) is required as a matter of law; (3) the LAD exempts Seton *1045 Hall from Romeo's claims; (4) Romeo's waiver argument is without merit and dismissal of the LAD claim is thus required; (5) Seton Hall cannot take any action which would "waive" its rights under the LAD; (6) the plain language of Seton Hall's policy statement is the standard for waiver of rights under New Jersey law and it will be interpreted in accord with the teachings of the Catholic Church; (7) as a matter of law, no unilateral contract could be created; and (8) the motion judge erred in ruling that Woolley v. Hoffmann-LaRoche, 99 N.J. 284, 491 A.2d 1257 (1985) applied to the student handbook.
Anthony Romeo is an openly gay student at Seton Hall University. He claims he elected to attend Seton Hall in part because of its published antidiscrimination policy, which he argues created a "unilateral contract" binding upon it. On November 13, 2003, he applied to the Seton Hall University Department of Student Affairs for provisional recognition of a gay and lesbian student organization to be named "TRUTH," an acronym for the phrase "Trust, Respect and Unity at The Hall." Dr. Laura A. Wankel, Vice President of Student Affairs at Seton Hall, responded to Romeo's application in a December 18, 2003 letter, stating in pertinent part:
The most compelling guidance from the Church directs us to care for the human person whose fundamental identity is as a "child of God"  not as a "heterosexual" or a "homosexual." The Church teaches that an exclusive focus on a person's sexual orientation denies the fullness of human dignity and diminishes persons in a way that is both reductionist and marginalizing. As a result, although SOAC [Student Organization Activities Committee] recommended to me that "TRUTH" be approved, I am informing you that your application for provisional recognition has been denied. No organization based solely upon sexual orientation may receive formal University recognition.
* * *
Further, the Division of Student Affairs remains prepared to work with gay and lesbian students to meet their needs. I am committed to working collaboratively with you and other students in fostering a positive, safe and caring community. To that end, I am providing the following plan that outlines how we may move forward.
The plan referenced in her letter was entitled "Memorandum of Understanding," and provided guidelines for gay and lesbian students wishing to operate as a group within the Seton Hall University community. The guidelines in the memorandum offered privileges, including the ability to: (1) sponsor educational events, meetings and programs; (2) sponsor volunteer and community service initiatives; (3) provide a forum for the exchange of views; (4) support gay students through campus educational programs aimed against discrimination; (5) elect officers and have ad hoc committees; and (6) request funds for particular activities and the use of other resources.
This proposal was not satisfactory to the students, and thus, Romeo filed his complaint on March 10, 2004, alleging violations of the LAD and breach of contract. The complaint was dismissed, but on a reconsideration motion the dismissal was vacated and Romeo was granted leave to amend. The appeal is from that order.

I.
Seton Hall first argues that the motion judge erred in denying its motion *1046 to dismiss. As our discussion will indicate, it was error not to dismiss the complaint.
Under N.J.S.A. 10:5-12(f) the owner of a place of public accommodation may not discriminate against any person on various grounds stated, including "sexual orientation." This term is broad and not defined in the statute.
However, Seton Hall argues that it is exempt from the provisions of the LAD by virtue of N.J.S.A. 10:5-5(l ), which states: "nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution."
Seton Hall argues that the dismissal of Romeo's claims under the LAD is required as a matter of law based on the exemption in N.J.S.A. 10:5-5(l ). It is not disputed that Seton Hall qualifies as an educational facility operated by a bona fide religious institution. Thus, by its very terms the provisions of LAD, including the prohibition of discrimination based on sexual orientation, see N.J.S.A. 10:5-3, do not apply to such religiously affiliated institutions.
Romeo argues that Seton Hall waived its exemption through the written statement found in its "Non Discrimination Policy":
No person may be denied employment or related benefits or admission to the University or to any of its programs or activities, either academic or nonacademic, curricular or extracurricular, because of race, color, religion, age, national origin, gender, sexual orientation, handicap and disability, or veteran's status.
It was conceded by Romeo's attorney at oral argument that Romeo was not denied "admission to the University or to any of its programs or activities" based on his "sexual orientation."
In response to Romeo's contention that Seton Hall, through its internal "Non Discrimination Policy" which is listed on its website and in its handbooks, waived the statutory exemption, Seton Hall argues that it could not waive its exemption and did not do so by adopting its antidiscrimination policy. It asserts that First Amendment protections and considerations under the United States Constitution also apply. See Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (relying on First Amendment right of expressive association). It thus argues that Romeo's complaint must be dismissed as a matter of law.
Our Supreme Court has utilized Title VII case law "for guidance in developing standards to govern the resolution of LAD claims." Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 631, 660 A.2d 505 (1995) (citations omitted).
In Little v. Wuerl, 929 F.2d 944 (3d Cir.1991), the Third Circuit discussed the issue of waiver of a religious exemption in the Title VII context. The court held: "Once Congress stated that "[t]his title shall not apply" to religiously-motivated employment decisions by religious organizations, no act by Little [the plaintiff] or the Parish [the defendant] could expand the statute's scope." Id. at 951.
The Sixth Circuit agreed with Little, stating that "the statutory exemptions from religious discrimination claims under Title VII cannot be waived by either party." Hall v. Baptist Memorial Health Care Corp., 215 F.3d 618 (6th Cir.2000) (citing Little, 929 F.2d at 951; Siegel v. Truett-McConnell College, Inc., 13 F.Supp.2d 1335, 1345 (N.D.Ga.1994), aff'd 73 F.3d 1108 (11th Cir.1995)).
The exemptions reflect a decision by Congress that religious organizations have a constitutional right to be free from government intervention. Id. "Once Congress stated that `[t]his title *1047 shall not apply' to religiously-motivated employment decisions by religious organizations," neither party could expand the statute's scope. Siegel, 13 F.Supp.2d at 1345 (quoting Little, 929 F.2d at 951). Accordingly, the court in Ward v. Hengle, 124 Ohio App.3d 396, 400, 706 N.E.2d 392 (1997), held that the trial court need not even determine whether a church waived its Title VII exemption from religious discrimination claims based on a statement in its employment handbook that it would not discriminate against its personnel on the basis of religion. See also Siegel, 13 F.Supp.2d at 1344 (government funds are most likely available to all institutions of higher learning whether or not they have a religious affiliation).
[Hall, 215 F.3d at 625.]
In Egan v. Hamline United Methodist Church, 679 N.W.2d 350 (Minn.Ct.App. 2004), the Minnesota Court of Appeals addressed a similar issue. The plaintiff in Egan argued that the church had waived its exemption to a statute prohibiting discrimination on the basis of sexual orientation due to the church's commitment to non-discrimination on the basis of sexual orientation, as provided in the church's Personnel Handbook and the United Methodist Church's The Book of Discipline. Id. at 352-356. After discussing the waiver issue in the Title VII context, in particular Little and Hall, the court held:
we would not take the rule from the Title VII cases to its logical extreme. We do not hold that it is impossible for churches to waive their exemption from the MHRA. If the waiver is specific and unequivocal, and if the scope of that waiver is evident, then there is not a risk of entanglement. It ought to be recognized. It would be illogical and unjust to ignore such a waiver; however, a pronouncement by the religious organization that it will conform to the principle of nondiscrimination only indicates an intent to voluntarily embrace that principle. Without greater clarity, we would be compelled to conduct an examination and interpret statements of Hamline Methodist and the United Methodist Church on doctrinal policy as it relates to the alleged reason for an employee's discharge. This invites an unconstitutional entanglement of the church with the judicial and administrative branches of government. [Id. at 358.]
The court proceeded to hold that the policy at issue did not constitute an effective waiver. Ibid. The court noted:
the debate over sexual orientation in religious bodies is highly contentious and the position of religious organizations on this subject may be revised from time-to-time. The legislature has decided to balance the prohibition against discrimination that deprives individuals of basic human dignity with a recognition of the importance of religious freedoms guaranteed in the First Amendment of the United States Constitution. The right to be free from discrimination and retaliation based on sexual orientation is provided by state statute. The legislature has authority to define the scope of the statutory protection. Embodied in the provisions of the MHRA is the legislature's recognition that the government interest in eliminating such discrimination is outweighed by the rights of religious associations to be free from government intervention in matters of doctrine and governance and in matters related to the sexual orientation of religious staff. The decision of Hamline Methodist to invoke its statutory right to be exempt from the requirements of the MHRA may make its commitment to nondiscrimination appear hollow. But, when *1048 faced with such conflicts, it is for the religious organization, not the government, to resolve possible inconsistencies between Hamline Methodist's policies in principle and its policies in practice. Absent a specific waiver, the legislature's decision not to intrude upon this process does not violate the Establishment Clause of the First Amendment and should be respected.
[Id. at 359.]
Cases such as Little persuade us to conclude that the exemption in N.J.S.A. 10:5-5(l ) of the LAD cannot be waived. But, even if Seton Hall could waive the exemption, its antidiscrimination policy is general and akin to that in Egan, which the Minnesota Court of Appeals deemed inadequate to constitute a waiver. Thus, Romeo's claim under the LAD fails as a matter of law.

II.
Seton Hall also argues that its antidiscrimination policy did not create a unilateral contract, and therefore, could not be breached as alleged by Romeo. It contends that as a matter of law, Romeo's breach of contract claim cannot stand.
The parties dispute the effect of Seton Hall's antidiscrimination policy that states in pertinent part:
No person may be denied employment or related benefits or admission to the University or to any of its programs or activities, either academic or nonacademic, curricular or extracurricular, because of race, color, religion, age, national origin, gender, sexual orientation, handicap and disability, or veteran's status.
This policy has to be read in conjunction with the "Student Rights and Responsibilities" provision, also contained in the student handbook, which states in relevant part:
Students have the right to self-determination in their own affairs within the parameters of sound and reasonable judgment, and which are respectful of the values and mission of the University. Students may:
* * *
5. seek to join or organize clubs, organizations or associations that promote their common interests, and respect the values and mission of the University. Such organizations are required to submit a statement of purpose, a statement of compliance with all anti-discrimination polices of the University and a list of current officers. (emphasis added).
In determining whether Seton Hall's antidiscrimination policy constitutes a unilateral contract, the parties dispute the appropriateness of applying the standard in Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 307, 491 A.2d 1257 (1985), modified, 101 N.J. 10, 499 A.2d 515 (1985). Woolley held that an employment manual's provisions on job security constituted a binding contract between the employer and the employee "unless the manual elsewhere prominently and unmistakably indicates that those provisions shall not be binding or unless there is some other similar proof of the employer's intent not to be bound."
Seton Hall asserts that Woolley does not apply here because the university-student relationship markedly differs from an employer-employee relationship. We agree. The situation here is more appropriately analyzed under Mittra v. University of Medicine & Dentistry of New Jersey, 316 N.J.Super. 83, 719 A.2d 693 (App. Div.1998), where we said:
the relationship between the university and its students should not be analyzed *1049 in purely contractual terms. As long as the student is afforded reasonable notice and a fair hearing in general conformity with the institution's rules and regulations, we defer to the university's broad discretion in its evaluation of academic performance. [Id. at 85, 719 A.2d 693.]
In Mittra we ruled that a contractual relationship was not created by the UMDNJ's dissemination of a student handbook containing a student evaluation process. Ibid. In reaching this conclusion, we acknowledged our prior holding in Napolitano v. Trustees of Princeton Univ., 186 N.J.Super. 548, 566, 453 A.2d 263 (App.Div.1982), to the effect "that the relationship between a private university and its students can not be described either in pure contract or associational terms." Id. at 89, 453 A.2d 263. While recognizing that the tuition paid by the student in order to be educated at a university may in some circumstances be considered contractual consideration, "[w]e nevertheless emphasized the `necessity for independence of a university in dealing with the academic failures, transgressions or problems of a student.'" Id. (quoting Napolitano, 186 N.J.Super. at 567, 453 A.2d 263).
In Mittra, we recognized that Napolitano was decided before the decisions in Woolley and Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 643 A.2d 546 (1994). Woolley decided that "`[a]n employment manual providing terms and conditions of employment... includ[ing] grounds and procedures for dismissal can create an employment contract.'" Id. at 90, 491 A.2d 1257 (quoting Witkowski, 136 N.J. at 392, 643 A.2d 546). In the university context, Mittra determined that "[w]e nevertheless adhere to our holding in Napolitano rejecting the rigid application of contractual principles to university-student conflicts involving academic performance and limiting our scope of review to a determination whether the procedures followed were in accordance with the institution's rules and regulations." Ibid.
The standard in Woolley cannot be applied here in light of the inherent differences between the employer-employee relationship and the university-student relationship. As noted in Woolley:
A policy manual that provides for job security grants an important, fundamental protection for workers. If such a commitment is indeed made, obviously an employer should be required to honor it.
[99 N.J. at 297, 491 A.2d 1257.]
In Woolley it was considered important that an employer's policy manual "represents the most reliable statement of the terms of their employment." Id. at 298, 491 A.2d 1257. The Court stated: "Our courts will not allow an employer to offer attractive inducements and benefits to the workforce and then withdraw them when it chooses, no matter how sincere its belief that they are not enforceable." Id. at 300, 491 A.2d 1257. Finally, Woolley said that "the manual is an offer that seeks the formation of a unilateral contract  the employees' bargained-for-action needed to make the offer binding being their continued work when they have no obligation to continue." Id. at 302, 491 A.2d 1257. Clearly, application of the Woolley standard to a relationship outside of the employer-employee context, particularly the university-student relationship, is not appropriate.
Even if Woolley applied, Seton Hall's policy "prominently and unmistakably indicates" that student clubs, organization and associations can only be formed that "respect the values and mission of the University." The values and mission of Seton Hall as a private religious university were fully analyzed in Dr. Wankel's December *1050 18, 2003 letter denying "TRUTH" provisional recognition under church policy.
The position of the Catholic Church on its values and mission regarding homosexuality is described in various documents in the record. These documents were attached as exhibits to a certification in support of defendant's motion to dismiss. Included was an October 1, 1986 "Letter to the Bishops of the Catholic Church on the Pastoral Care of Homosexual Persons," which was approved by Pope John Paul II and adopted by the Congregation for the Doctrine of the Faith, on the subject. That document states in pertinent part that "Homosexual activity is not a complementary union, able to transmit life; and so it thwarts the call to a life of that form of self-giving which the Gospel says is the essence of Christian living...." The document further states that the human person cannot adequately be "described by a reductionist reference to his or her sexual orientation." The Church, it is said, does not consider an individual as a "heterosexual" or a "homosexual," but rather "insists that every person has a fundamental Identity: the creature of God, and by grace, his child and heir to eternal life." In addition, a March 20, 1992 opinion letter from the New Jersey Office of Legislative Services to a State Assemblyman regarding amendments to the LAD and other statutes, states that the New Jersey Catholic Conference was of the view that Catholic teaching "finds homosexual activity to be morally wrong."
In reaching her conclusion, Dr. Wankel analyzed the proposed recognition of "TRUTH" in light of the values and mission of the Catholic Church, as contemplated by the student handbook. Therefore, even under Woolley, the student application for provisional recognition of an entity neither created a contract nor provided a basis for a breach of contract claim. Rather, the case is more akin to Mittra. A contractual relationship cannot be based on isolated provisions in a student manual. Just as in Mittra, where the evaluation of a student's academic performance is left to the judgment of the university, a private religious university's values and mission must be left to the discretion of the university. The case for such discretion is even greater, where as here, the very values and mission in question address fundamental religious ideals. Courts should avoid entanglement in religious disputes involving ecclesiastical "polity or doctrine," as well as policy. Elmora Hebrew Center, Inc. v. Fishman, 125 N.J. 404, 415-416, 593 A.2d 725 (1991).
Romeo's breach of contract claim cannot stand as a matter of law.
Reversed.