NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4550
_____

PATRICK MCMAHON,
*Appellant*

v.

SUSAN W. SALMOND, Dean of the University
of Medicine and Dentistry of New Jersey School of Nursing;
RUTGERS, The State University of New Jersey


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-11-cv-02306)
District Judge:  Honorable Stanley R. Chesler
_____

Submitted Under Third Circuit LAR 34.1(a)
July 11, 2014

Before:  SMITH, VANASKIE and SLOVITER *Circuit Judges*

(Opinion Filed: August 4, 2014)


_____

OPINION
_____

SLOVITER, *Circuit Judge*.

Patrick McMahon appeals from the District Court's order granting the motion of the State University of New Jersey Rutgers ("Rutgers") and Susan Salmond for summary judgment. For the following reasons, we will affirm.[1]

## I. Background

McMahon is a decorated former Air Force Captain who has completed a number of undergraduate and graduate degrees. In April 2007, McMahon matriculated into the University of Medicine and Dentistry of New Jersey ("UMDNJ") Certified Registered Nurse Anesthesia ("CRNA") program to become a nurse practitioner who receives training and certification in anesthesia care. McMahon began taking classes towards CRNA certification in September 2007.

The parties debate which grading policy was in effect and applicable to McMahon. The Spring 2007 CRNA Policy and Procedure Manual ("2007 PPM") required that students "maintain a cumulative GPA of 3.0" and "at least a C grade in all basic sciences and the anesthesia specialty courses." (App. 81) A School of Nursing policy document entitled "Satisfactory Academic Progress," dated April 27, 2009, stated that "Standards for Satisfactory Academic Progress included in 'Requirements for Graduation' distributed to a student upon matriculation are applicable for the duration of the student's continuous matriculation in the same program, despite any changes in standards that may

---

[1] The District Court had jurisdiction over the Constitutional due process claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over McMahon's state law claims pursuant to 28 U.S.C. § 1367(a). We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* a district court's grant of summary judgment. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008) (citation omitted).

2

apply to newer matriculants." (App. 89) The 2008 CRNA Program Policy and Procedure Manual ("2008 PPM") explained that "Academic policies of the Nurse Anesthesia Program are congruent with policies published in the UMDNJSN Student Handbook." (App. 113) The 2008 PPM also required that

> grades of 3.0 (B, 80%) or better must be earned in all didactic and a P (pass) grade in all clinical pre-requisite courses . . . . A one time exemption allows a student in the nurse anesthesia program to earn a grade of C+ in a course and still remain in the program, on a probationary status. . . . A cumulative GPA less than 3.0 or earning of any single course grade less than B (80%), will initiate immediate academic probation. . . . If at any time during the program of study, a student earns a second course grade below 3.0 (B, 80%), . . . he/she earns immediate academic dismissal from the Nurse Anesthesia Program.

(App. 113-14)

While McMahon's GPA remained above a 3.0 during his time in the program, he did not receive all grades at or above a "B." He received a "C" in Advanced Physiology in Fall 2007, a "C+" in Anesthesia & Co-Existing Disease in Spring 2009, and in Spring 2010, a "C" in Pediatric Anesthesia and a "C+" in Obstetrics. After his first "C", McMahon appealed his grade arguing that it was improperly calculated and that Professor Thomas Pallaria failed to give him a reasonable accommodation for a hearing impairment. McMahon also complained that Professor Pallaria was making discriminatory statements regarding the elderly, obese individuals, homosexuals, and minorities. The school denied his appeal and upheld the "C" grade. In the denial letter, Dean Salmond cautioned "that another course failure [C grade] in the future may lead to [his] dismissal from the UMDNJ School of Nursing." (App. 134) Rutgers permitted him

3

to retake the class; McMahon retook the class and received a "B". The school took no action against Professor Pallaria based on McMahon's complaint.

McMahon also appealed his second grade lower than a "B", the "C+" in Anesthesia & Co-Existing Disease, also taught by Professor Pallaria. Again, the school upheld McMahon's grade and permitted McMahon to retake the class "since this grade occurred under the previous grade policy." (App. 141)

In summer 2009, McMahon's mother passed away. After some back and forth with the school, Rutgers permitted him to retake or reschedule his exams until after the funeral. Shortly thereafter, McMahon received orders to report for active duty training. There is evidence in the record that Rutgers initially balked at McMahon's request to choose whether he would withdraw from or receive an incomplete in the courses in which he was enrolled. After the initial refusal from the school to permit McMahon to select either to withdraw or take an incomplete and a subsequent letter by McMahon's attorney, Rutgers permitted McMahon to either withdraw from his classes or receive incompletes as required by New Jersey law. It was arranged that McMahon would reenroll in Summer 2010 when the courses would be offered again.

McMahon met with Dean Salmond shortly after the funeral to discuss McMahon's academic performance, and at that meeting McMahon signed a document in which he acknowledged, "Any future course grade of C+ or less will constitute immediate dismissal from the CRNA program." (App. 143) The document also set forth the school's requirements for him to successfully complete the program including attendance at time management and how to take exam classes and an offer for him to contact a

4

professor, Dr. Golden, should McMahon need additional academic support such as tutoring sessions. During this time McMahon "received negative evaluations from at least two clinical preceptors." (App. 145) Their written reports cited deficiencies including "a lack of a patient-specific anesthetic care plan; late arrival; disorganization; and improperly prepared equipment and drugs." (*Id.*) As a result of these negative reports and the concerns for patient safety, McMahon was "temporarily removed from the clinical practicum pending a fitness evaluation." (*Id.*) Based on these concerns, shortly after McMahon had submitted his request for military leave, Dean Salmond ordered that McMahon have a fitness evaluation. The doctor evaluating McMahon concluded that McMahon showed no evidence of underlying psychotic symptoms.

Due to the schedule of available classes, McMahon could not resume his studies until summer 2010 at which time he received the two additional grades below "B". Although McMahon's cumulative GPA was above a 3.0, Rutgers dismissed McMahon from UMDNJ based on his receipt of a "C" in Pediatric Anesthesia. The dismissal letter referenced McMahon's June 2009 signed acknowledgement that any further "C" grades would result in his dismissal. It also directed him to the academic appeals process. McMahon appealed the decision to the school and the school held a hearing. McMahon did not have counsel and could not confront witnesses or call witnesses on his behalf. The Student Affairs Committee upheld McMahon's grade of "C" in Pediatric Anesthesia and concluded that pursuant to the school's academic policies McMahon had exceeded the permissible number of "failing" grades and, as a result, was dismissed. Dean Salmond affirmed the Committee's decision.

McMahon filed suit against Rutgers and Dean Salmond in New Jersey Superior Court alleging both contractual and Constitutional claims. Appellees removed the case from state to federal court. After a year of discovery, Appellees moved for summary judgment on all claims and the District Court found in favor of Appellees on all counts.

## II. Discussion

### 1) Contract Claims

#### a) McMahon's Contractual Claims Against Rutgers

The District Court concluded that under New Jersey law, courts have a limited role in resolving academic conflicts between students and universities and that McMahon's argument that the 2009 policy had the ex post facto effect of binding Rutgers to the more lenient grading policies was unconvincing. McMahon argues that New Jersey law permits a student to bring contractual claims against a public university or, at a minimum, quasi-contract theory applies to resolve conflicts between public universities and students and that under these theories, Rutgers was bound to apply the more lenient grading policies to McMahon.

New Jersey courts have recognized certain instances where a student may bring a viable breach-of-contract type claim against a public university. *See, e.g.*, *Mittra v. Univ. of Med. and Dentistry of N.J.*, 719 A.2d 693, 696-97 (N.J. Super. Ct. App. Div. 1998). Specifically, the New Jersey state courts have concluded "that the courts may intervene where the institution violates in some *substantial* way its rules and regulations pertaining to student dismissals." *Id.* at 698 (emphasis added) (discussing the holding of *Napolitano v. Trustees of Princeton Univ.*, 453 A.2d 263 (N.J. Super. Ct. App. Div. 1982), the first

6

reported New Jersey opinion dealing with whether contract principles should be applied in resolving disputes involving student dismissals for academic reasons). The court in *Mittra* rejected "the rigid application of contractual principles to university-student conflicts involving academic performance and limit[ed] [the] scope of review to a determination [of] whether the procedures followed were in accordance with the institution's rules and regulations." 719 A.2d at 697.

Thus, as the District Court also concluded we must first determine which of UMDNJ's rules and regulations—i.e. grading policy—were applicable to McMahon at the time in question. Despite McMahon's attempts to extend the earlier grading policy to his later semesters, the only basis for this assumption is the 2009 policy which was not in effect at the time of the 2007 PPM that McMahon seeks applied to his tenure at UMDNJ. The 2009 Policy stated that "Standards for Satisfactory Academic Progress included in 'Requirements for Graduation' distributed to a student upon matriculation are applicable for the duration of the student's continuous matriculation . . . ." (App. 89) However, Appellees argue that the phrase "requirements for graduation" refers to a student's course requirements as opposed to grade requirements and serves to effectuate "certain regulatory requirements in order for the School to be eligible for federal financial aid funding." (Appellee's Br. 183) Thus, Appellees argue that the policy refers to a student's course requirements to ensure that a given program will not extend the length of the program so as to compel a student to incur additional financial aid debt as opposed to the grades required for graduation. Even without this justification, McMahon presents no

7

basis upon which to retroactively bind UMDNJ to the 2007 handbook because of the later 2009 policy.

Not only did McMahon sign a document acknowledging that receipt of any further "C"s would permit his immediate dismissal, but in the tape recorded conversation with Dean Salmond, McMahon stated that he understood that he was not previously dismissed from UMDNJ because those grades were earned under the previous grading system. Although Dean Salmond did state that different students could have different applicable grading policies based on when they matriculated, this does not lead a reasonable factfinder to McMahon's conclusion that Dean Salmond admitted that the more lenient grading policy should have followed McMahon for years to come.

UMDNJ's rules and regulations, that McMahon acknowledged applied to him by signing the document and in meeting with Dean Salmond, required that McMahon not receive a second "C" grade. Pursuant to these rules, UMDNJ could have dismissed McMahon after his second "C"—they did so upon receipt of his third and fourth. In sum, McMahon does not present sufficient factual evidence that a reasonable factfinder could rely on to conclude that UMDNJ violated its rules and regulations in some substantial way as required by New Jersey law.[2]

---

[2] McMahon also challenges the District Court's summary dismissal of his promissory estoppel, good faith and fair dealing, and unjust enrichment claims. However, as previously stated judicial review in this area is limited and under New Jersey law, rigid contract principles are not applied. *See Mittra*, 719 A.2d at 697. Moreover, McMahon fails to demonstrate any clear and definite promise to support a claim for promissory estoppel, any underlying contract for the application of good faith and fair dealing claims, and any quasi-contract liability basis for a claim of unjust enrichment.

## 2) **Due Process Claim**

McMahon claims that he has a property interest protected by the Due Process Clause in continuing his graduate education at a public institution and that "due process required that his education in the masters degree CRNA program not be terminated for arbitrary reasons." (Appellant's Br. at 46, 47)

In *Board of Curators, University of Missouri v. Horowitz*, 435 U.S. 78, 91–92 (1978), the Supreme Court assumed that a property right existed without deciding whether there is in fact such a right, and held that federal courts can review an academic decision of a public educational institution under a substantive due process standard. Similarly, in *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 222-25 (1985), the Court noted "Justice Brandeis' admonition not to 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,'" and again assumed, as it did in *Horowitz,* the existence of a constitutionally protectible property right in the student's continued enrollment in a dual degree program. *Id.* at 222 (citing *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (concurring opinion)).

Similar to *Ewing* and *Horowitz*, we may presume that McMahon had a property interest in his continuing in the graduate program at UMDNJ. Therefore, we then turn to whether UMDNJ arbitrarily dismissed McMahon. When judges are asked to substantively review a "'genuinely academic decision, . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Mauriello v.*

9

*Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 50 (3d Cir. 1986) (*quoting Ewing*, 474 U.S. at 225)). In *Mauriello*, the plaintiff was informed of her academic deficiencies, given an opportunity to rectify them during a probationary period, and was allowed to present her grievance to the graduate committee. This court concluded that as a matter of law the plaintiff had received all the due process to which she was entitled. 781 F.2d at 52.

There is no difficulty in deciding in this case that McMahon's dismissal was based on academic grounds and not due to other non-academic disciplinary grounds. Following *Mauriello*, we must conclude that McMahon received all the process to which he was entitled. UMDNJ notified McMahon of his grades below a "C," he received written warnings that any further grades below a "C" could result in dismissal, and he signed a statement acknowledging that warning. Moreover, he was provided the opportunity to retake the classes in which he received his first two grades below a "B" and the opportunity to appeal each grade to the Student Affairs Committee.

Additionally, there is no evidence in the record that UMDNJ terminated McMahon's enrollment for arbitrary reasons. The District Court correctly concluded that the record demonstrates that McMahon was dismissed for his academic performance, i.e. multiple "C" grades. Therefore, even assuming that McMahon has a property interest in continuing his graduate education at a public institution, the Appellees committed no due process violation.

### 3) **Armed Forces Discrimination Claims**

McMahon alleges discrimination due to his membership in the U.S. Air Force and retaliation based on the same in violation of the New Jersey Law Against Discrimination ("LAD"). The LAD makes it unlawful for any person to refuse to provide goods, services, or information to a person on the basis of their service in the U.S. Armed Forces. § 10:5-12(l). When analyzing cases under the NJ LAD, New Jersey and federal courts look to the closest analogous federal statute and adopt its evidentiary framework. *See Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 906–07 (N.J. 1990). The federal statutory analogue to McMahon's NJ LAD claim is the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). Accordingly, the parties did not dispute the application of the *Sheehan v. Department of Navy*, 240 F.3d 1009 (Fed. Cir. 2001), framework to McMahon's claim. To establish a claim under the USERRA, the plaintiff has the initial burden of production to show that, by a preponderance of the evidence, "the employee's military service was 'a substantial or motivating factor'" in the adverse employment decision. *Sheehan*, 240 F.3d at 1013 (quoting *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400-01 (1983)).

Here, McMahon cannot meet the first step of the *Sheehan* framework because there are not sufficient facts in the record to conclude that any discrimination or retaliation occurred based on McMahon's military status.[3] McMahon cites to the

---

[3] The District Court assumed *arguendo* that in this case McMahon had met his burden to show that his military status was a "substantial and motivating factor" in his dismissal from the CRNA program, but concluded that Appellees met their burdens of production

11

school's initial refusal to permit him to select either to withdraw or take an incomplete for the courses he was enrolled in at the time of his request, and the fact that UMDNJ required that he submit to a fitness evaluation two days after submitting his request for military leave. UMDNJ ultimately permitted McMahon to receive withdraws or incompletes on his record as required under the law and the school's "balking" at his initial request does not rise to the level of discrimination under *Sheehan*. Additionally, it is clear from the record that the school received reports of McMahon's poor clinic performance in regard to patient safety and he was ordered suspended from clinic until completion of a fitness evaluation. McMahon does not point to any evidence in the record aside from the closeness in dates between his request for military leave and the requirement of a fitness evaluation, to demonstrate that his military association had any bearing on Dean Salmond's requiring him to submit to a fitness evaluation. Thus, his claim under the NJ LAD must fail.

McMahon also brings a retaliation claim under the LAD which must similarly fail. McMahon cites to no record evidence that he was dismissed from the CRNA program as a reprisal against him on the basis of his service in the armed forces. Although McMahon cites to his complaint about Professor Pallaria, who allegedly made discriminatory statements about older and obese people, and the school's failure to address his complaint, these do not relate to his service in the military. Even if Pallaria had retaliated against McMahon for McMahon's filing a complaint against Pallaria,

and persuasion by demonstrating that McMahon's dismissal was based on grades. We see no reason to assume that McMahon has met his burden.

12

McMahon alleges a retaliation claim based on his service in the Armed Forces. Although in his brief before this court McMahon alleges that "[t]his is a separate and distinct claim, as specifically pled in the complaint" irrespective of his membership in the Armed Forces, McMahon provides no citation to his complaint or where this was alleged. The District Court concluded that McMahon did not plead an appropriate retaliation cause of action and that it "would not read his opposition papers to do so" at summary judgment. (App. 25 (citing *Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."))). McMahon provides no basis in the record or in case law upon which to reverse the District Court's decision.

### III. Conclusion

For the foregoing reasons, we will affirm the District Court's grant of Appellees' motion for summary judgment.